806 So.2d 854 (2001)
STATE of Louisiana
v.
Eugene WILSON.
No. 01-0625.
Court of Appeal of Louisiana, Third Circuit.
December 28, 2001.
*856 Ahmad Muhammad, Lorman, MS, Counsel for Defendant/Appellant, Eugene Wilson.
C. Brent Coreil, District Attorney, Trent Brignac, Assistant District Attorney, Evangeline Parish, Ville Platte, LA, Counsel for State of Louisiana.
Court composed of ULYSSES GENE THIBODEAUX, BILLIE COLOMBARO WOODARD and GLENN B. GREMILLION, Judges.
THIBODEAUX, Judge.
The Defendant, Eugene Wilson, appeals his convictions and sentences for theft of $100.00 and $500.00 and forgery. He was sentenced to one and one half years at hard labor for theft and eight years at hard labor for forgery. The sentences were concurrent to each other.
Because of double jeopardy, we vacate the conviction and sentence for theft. We affirm the conviction and sentence for forgery.

FACTS
Defendant, Eugene Wilson, had a contract to transport "Welfare to Work" clients for the Evangeline Parish-area Acadiana *857 One Stop Program.[1] In May of 1999, Defendant forged the signature of a client who was no longer using the service, and turned in log-sheets bearing the forged signatures to Acadiana One Stop for reimbursement. Based upon the falsified signatures, the program overpaid Defendant between $100.00 and $500.00.

ASSIGNMENT OF ERROR NO. 1:
In his first assignment, Defendant argues that the evidence adduced against him was insufficient to support his convictions for forgery and theft. The law regarding sufficiency of evidence is well-established:
When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, rehearing denied, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); State ex rel. Graffagnino v. King, 436 So.2d 559 La.1983); State v. Duncan, 420 So.2d 1105 (La.1982); State v. Moody, 393 So.2d 1212 (La.1981).
The elements of the crimes at issue are set forth in their respective statutes. Forgery is proscribed by La.R.S. 14:72:
Forgery is the false making or altering, with intent to defraud, of any signature to, or any part of, any writing purporting to have legal efficacy.
Issuing or transferring, with intent to defraud, a forged writing, known by the offender to be a forged writing, shall also constitute forgery.
Whoever commits the crime of forgery shall be fined not more than five thousand dollars, or imprisoned, with or without hard labor, for not more than ten years, or both.
Theft is proscribed by La.R.S. 14:67. The theft at issue occurred in 1999; at that time, the statute stated, in pertinent part:[2]
A. Theft is the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential.
B. . . .
(2) When the misappropriation or taking amounts to a value of one hundred dollars or more, but less than a value of five hundred dollars, the offender shall be imprisoned, with or without hard labor, for not more than two years, or may be fined not more than two thousand dollars, or both.
(Emphasis added.)
Thus, to support the forgery conviction, the State had to prove beyond a reasonable doubt that Defendant "falsely made" signatures of the client with the intent to defraud, and that the log-sheets had legal efficacy. To support the theft conviction, the State had to prove beyond a reasonable doubt that Defendant took something of value from Acadiana One Stop without its consent, and had the intent to deprive the organization of the thing permanently.
*858 Regarding forgery, the State introduced testimony that Defendant signed client Robin Matte's name to passenger log-sheets, without her authorization, for days on which she was not a passenger. Ms. Matte testified that she never signed any passenger log sheets and never authorized anyone else to sign on her behalf. Thus, the State proved the signatures were falsely made. Witnesses also testified that Defendant stated to her that he was making the signatures in order to get paid, and officials from Acadiana One Stop testified that the log-sheets were used to determine payment to Defendant, which was per passenger per round-trip, rather than per mile. Thus, the State also proved that Defendant had the intent to defraud, and that the log-sheets had legal efficacy.
Chris Dunbar, administrator for the area Workforce Investment Act Program, said that drivers were paid per round-trip person. He explained that drivers submitted the log-sheets to the program to receive payment for services rendered. Dunbar stated that Defendant was paid for transporting Ms. Matte on the various dates purporting to bear her signature, and that Defendant should not have been paid for days on which Ms. Matte did not in fact ride.
The above evidence was sufficient to support Defendant's forgery conviction. Additionally, the evidence supported the theft conviction. Defendant argues in brief that the State failed to show that Defendant took "anything of value." However, the testimony shows that Defendant engaged in fraudulent practices to misappropriate money from the Work Investment Act/Acadiana One Stop Program. Administrator Chris Dunbar testified that the program paid the Defendant an amount between $100.00 and $500.00 that it did not owe him, as a result of the falsified signatures on the log-sheets.
This assignment lacks merit.

ASSIGNMENT OF ERROR NO. 2:
In his second assignment of error briefed, Defendant argues that the trial court erred by giving an improper "Allen charge" to the jury. This court has discussed the Allen issue:
In [State v.] Nicholson, 315 So.2d 639 [(La.1975)], the supreme court set limits to the instructions that a trial judge can give to a jury after the jury announces it cannot reach a verdict. In Nicholson, the court held when a trial court gives a deadlocked jury an instruction that rises to the level of being an "Allen charge" or any "coercive modification" of an Allen charge, the trial court has committed reversible error. The Allen charge originated in Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), where the United States Supreme Court approved a charge designed to break a jury deadlock and accomplish jury unanimity. One characteristic of an Allen charge is an admonition to the jurors in the minority to reconsider their opinion in favor of the majority in order to reach a decision. State v. Schamburge, 344 So.2d 997 (La. 1977); State v. Washington, 93-2221 (La.App. 1 Cir. 11/10/94); 646 So.2d 448; State v. Caston, 561 So.2d 941 (La.App. 2 Cir.1990); State v. Campbell, 606 So.2d 38 (La.App. 4 Cir.1992). A second characteristic is the trial court implying to the jury that it must reach a decision because the trial court will not accept a mistrial. Id.

The Louisiana Supreme Court has banned the use of Allen charges and "modified" Allen charges to ensure that juror verdicts are not the product of coercion. Schamburge, 344 So.2d 997; Nicholson, 315 So.2d 639. "When the *859 duty to reach a verdict is coupled with the trial court's admonition that those in the minority should reconsider their position, there exists an almost overwhelming pressure to conform to the majority's view." Washington, 646 So.2d at 454-455.
State v. James, 96-472, pp. 3-4 (La.App. 3 Cir. 12/11/96); 687 So.2d 485, 487, writ denied, 97-69 (La.5/16/97); 693 So.2d 796.
In the midst of deliberations, the jury returned to the courtroom and informed the judge that it was deadlocked on the issue of guilt or innocence. The judge instructed them:
Well let me tell ya'll what ya'll have to do. It's only, it's only 10 to 2:00 and I'm going to give ya'll these instructions. I'm gonna tell ya'll to go back in the jury room and to, to discuss it again from every point of view. I want each of you to speak your part and I want you to answer the questions of the other five, I, in other words I want a good discussion. I don't want to call a mistrial over here and have to try this case over and ya'll have only been deliberating since passed [sic] 11:00, it's not even, it's not even three hours and ya'll had a lunch break so I think it's too soon to give up. So I'm gonna instruct ya'll to go back there, maybe a fresh pot of coffee is gonna help and look the afternoon is young, the sun don't set until late, we have already invested some money in this case as ya'll know, there's some expenses that are being made, and let's exhaust every possibility before we call a mistrial, okay.

BY MR. MUHAMMAD: (Defense Counsel)
Your Honor before we go I, I....
Your Honor based, at this time based on the testimony of the foreman we would make a motion for a mistrial based on the fact that the foreman has declared to the Judge that they are hopelessly deadlocked....
BY THE COURT:
But that, but that happens all the time when they can't, they're hopelessly deadlocked and I think every Judge sends them back in to deliberate at least one or two more times before giving up, I'm gonna deny your motion.
BY MR. MUHAMMAD:
Thank you Your Honor.
BY THE COURT:
Sure. I'm not, the record will show I haven't put any pressure on these jurors, I haven't made any threats, I haven't done anything like that and they haven't even been deliberating for three hours. Sometimes it takes six hours, nine hours, sometimes it takes two weeks. All right recess until we get further notice.

JURY CONTINUED DELIBERATING
In its brief, the State cites this court's discussion in James:
In the present case, the jury announced it was not able to reach a verdict after three hours of deliberation. When the trial court asked the jury foreman if he thought the jury would be able to reach a verdict with additional deliberation, the foreman answered, "At this time, no, your Honor." The trial court then ordered the jury taken out and recessed court for fifteen minutes to research case law concerning instructions a trial judge can give to a jury when the jury announces it cannot reach a verdict. After the recess, the trial court gave the following instruction to the jury:
All right. I have this additional instruction for you to consider and act on. This is an important case, and I'm going to return you to deliberate *860 for thirty more minutes and urge you to come to an agreement. Do not, however, surrender your individual opinions just to reach a verdict, but do consider the other juror's views whether you're in the minority or in the majority, consider the other's views and weigh it against your own conclusions, and I'll have the jury return to further deliberate for thirty minutes.
In giving this instruction, the trial court did not imply to the jurors that it would not accept a mistrial, nor did it attempt to coerce the jury members holding the minority viewpoint to accept the majority position. The trial court's instruction does not contain the restrictive elements that characterize an Allen charge or a modified version of an Allen charge. It was also within the discretion of the trial court to "urge [the jurors] to come to an agreement." In Governor, 331 So.2d at 453, the Louisiana Supreme Court stated:
It is safe to state as a settled proposition that when the Court is informed by a jury that they cannot agree, it is not error for the court to impress upon them the importance of the case, urge them to come to an agreement, and send them back for further deliberation...
(Emphasis added.)
The charge given by the trial court does not rise to the level of an Allen charge or a modified Allen charge, and therefore, the trial court did not abuse its discretion by giving this instruction to the jury. This assignment of error lacks merit.
Id. at 488.
The instruction in the present case is analogous to the one analyzed by this court in James. The trial judge's reference to financial considerations, i.e., "we have already invested some money in this case as ya'll know, there's some expenses that are being made, and let's exhaust every possibility before we call a mistrial, okay," is inappropriate but not so coercive as to require reversal. In State v. Nicholson, 315 So.2d 639 (1975), the court stated:
The first paragraph of the substantive part of the charge emphasizes that there must, `sooner or later,' be a disposition of the case. The court focuses on the lack of any basis for believing that the case could later be tried better by a more intelligent, more impartial or more competent jury, unmistakably indicating to the lay jury that if the case were to end in a mistrial it would definitely have to be tried again. The tenor of such instructions, in conveying to the deadlocked jury the impression that their inability to reach a verdict would absolutely insure the expenditure of time and money necessitated by a complete retrial, is somewhat misleading. `* * * Despite the possibility that a case may be retried and decided, the prosecution may conclude after a mistrial that it simply does not possess evidence sufficient to justify another trial and decide to drop charges completely. * * *' We believe that the implications of this portion of the charge are misleading and present a substantial risk that a juror or jurors possessed of a genuine conviction that reasonable doubt exists would thereby be coerced into agreement with a majority voting to render a guilty verdict.
Id. at 641-42 (citations omitted).
The trial court's observation that money had been spent on the trial did not speculate regarding a second trial. Also, the instruction did not admonish "minority" jurors to reconsider their opinions in favor of the majority, and did not imply that the court would not accept a mistrial. Thus, *861 the court's instruction did not raise the concerns seen in Nicholson.
Therefore, in light of James, a similar conclusion is warranted, and the assignment thus lacks merit.

ASSIGNMENT OF ERROR NO. 3:
In his third assignment briefed, Defendant claims the trial court erred when it failed to remove for cause juror Geneva Comeaux. After being sworn in, Ms. Comeaux informed the trial court that she knew Robin Matte, a witness for the State. Ms. Matte's sister apparently lived with her grandmother, but would stay at Ms. Comeaux's house four or five days a week. Ms. Comeaux's familiarity with Ms. Matte, the Defendant says, raised the possibility that the juror would be partial to the State.
The Fourth Circuit recently analyzed a similar scenario:
Following Officer Belisle's testimony, a conference was held outside the presence of the jury. The court stated that during the questioning of Officer Belisle one juror, Ms. Fentress, stated that she thought she might know the officer from possibly going to high school with him. The court indicated that when asked if she had any contact with him since high school, Ms. Fentress stated no. Further, she indicated she could be fair and impartial in the case. The court indicated that both parties were present when the discussion with the juror took place.
During the conference, counsel for Weaver noted that prior to voir dire the State had indicated the names of the officers it intended to call. Included among the names given was that of Officer Belisle. Yet, the juror failed to mention that she might know Officer Belisle. Accordingly, counsel moved to excuse the juror. The court denied the motion.
Our courts have addressed the issue of whether a juror should be excused when it is discovered during the trial that a juror knows or is related to a witness or victim.
In State v. Miller, 95-857 (La.App. 3 Cir. 1/31/96), 670 So.2d 420 defendant argued the trial court erred in refusing to remove a juror who admitted she had recently been told that she was related to the victim. On the third day of trial, the juror approached the trial court about a telephone call she received from her aunt the night before. A hearing was held in the trial judge's chambers with the juror, the attorneys, the trial judge, and the minute clerk being present. The juror stated that her aunt told her that the victim's grandfather and her father were first cousins. She also stated that she never visited with these family members when she was growing up so she did not know any of them. The court noted that the juror did not know of the relation during voir dire, nor did she know the victim personally. The trial court stated in court that the juror indicated that the relation would not affect her verdict and decided not to remove the juror from the jury. On appeal, the appellate court concluded that the trial court did not abuse its discretion in refusing to remove the juror because (1) she did not personally know the victim nor did she know of the relationship prior to the phone call; and (2) she informed the trial court that this would not affect her verdict.
In State v. Holland, 544 So.2d 461 (La.App. 2 Cir.1989), writ denied, 567 So.2d 93 (La.1990) the court was confronted with the problem of deciding whether to excuse a juror who discovered, after the trial had commenced, she might be related to the victim. A juror informed the judge that on the previous *862 evening his daughter had informed him that she received a telephone call from a person who identified himself as a venireman who had been excused. The caller told her that his grandfather was related to the victim and that he [the venireman] believed he was related to the daughter. After informing the judge of the call, the juror testified that he did not know whether he was in fact related to the excused venireman nor was he aware of the degree of kinship between the venireman and the victim. The juror stated that even if he were in some way related to the excused venireman (and thus the victim), it would not affect him or the process of his decision making. He stated that he could be fair and impartial. In upholding the trial court's refusal to excuse the juror, the court delineated the standard to be used in determining if a juror should be excused based on a relationship with a witness or the victim as follows:
A trial judge is granted great discretion in determining whether to seat or reject a juror for cause, and such rulings will not be disturbed without a showing of an abuse of that discretion. State v. Jones, 474 So.2d 919 (La. 1985). Disclosure during the trial that a juror knows or is related to a witness or the victim is not sufficient to disqualify a juror unless it is shown that the relationship is sufficient to preclude the juror from arriving at a fair verdict. State v. Peterson, 446 So.2d 815 (La.App. 2d Cir.1984). The connection must be such that one must reasonably conclude that it would influence the juror in arriving at a verdict. State v. Hodgeson, 305 So.2d 421 (La.1974). (emphasis added.)
State v. Holland, 544 So.2d at 465.
Significantly in the matter subjudice, Ms. Fentress only stated that she might possibly have known Officer Belisle from high school. If in fact she attended the same high school as the officer, it is apparent that her acquaintance with the officer was very slight, as she apparently did not recognize his name during the voir dire. Additionally, when making the motion to excuse Ms. Fentress, defense counsel noted that the State, "may have massacred" Officer Belisle's name during voir dire. If so, it is quite possible that Ms. Fentress did not recognize the officer's name because of the way the prosecutor pronounced the name. Regardless of the reason for the delayed realization that she might have known the officer from high school, Ms. Fentress indicated to the district judge that she could be fair and impartial. Under these circumstances, it cannot be said that the district court abused its discretion by denying Weaver's motion to excuse this juror. This assignment of error is without merit.
State v. Weaver, 99-2177, pp. 5-7 (La.App. 4 Cir. 12/6/00); 775 So.2d 613, 617-618. (Footnote omitted).
In light of the above authorities, the trial court did not err by refusing to remove juror Comeaux. Therefore, the assignment lacks merit.

ASSIGNMENT OF ERROR NO. 4:
In his fourth assignment, Defendant argues that a Batson violation occurred.[3] After the jurors had been sworn, but before the taking of evidence, Defense counsel raised a Batson objection regarding the exclusion of several African American jurors, listing them by name, for the record. The trial court ruled that there had been no systematic exclusion of Black jurors.
The jurisprudence regarding Batson is well-settled:

*863 Under Batson, a defendant must first establish a prima facie case of discrimination by showing facts and relevant circumstances which raise an inference that the prosecutor used his or her peremptory challenges to exclude potential jurors on account of race. The burden of production then shifts to the state to come forward with a race-neutral explanation, and if a race-neutral explanation is tendered, the trial court then must decide, in step three, whether the defendant has proven purposeful racial discrimination. Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam) (citations omitted); see also State v. Collier, 553 So.2d 815 (La.1989). The second step need not demand an explanation that is persuasive, or even plausible, and unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral. Purkett, 514 U.S. at 767, 115 S.Ct. 1769. The ultimate burden of persuasion remains on the defendant to prove purposeful discrimination. Id.; see also Batson, supra; Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). A trial judge's determination pertaining to purposeful discrimination rests largely on credibility evaluations and so his or her findings are entitled to great deference by the reviewing court. Batson, 476 U.S. at 98, n. 21, 106 S.Ct. at 1724, n. 21.
State v. Neal, 00-0674 (La.6/29/01); 796 So.2d 649.
It appears the trial court ruled that Defendant had not made out a prima facie case of discrimination. As the Fifth Circuit has explained:
To prevail on a Batson claim that a prosecutor has used peremptory challenges in a manner violative of the Equal Protection Clause, a defendant must first make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of a juror's cognizable racial background. In determining whether the defendant has established a prima facie case of discrimination, the trial judge should consider all relevant circumstances, including any pattern of strikes by the prosecutor against minority jurors, and any questions or statements by the prosecutor during voir dire examination or in the exercise of his challenges which may support or refute an inference of purposeful discrimination. Batson v. Kentucky, 476 U.S. at 98, 106 S.Ct. at 1722-1723; State v. Collier, 553 So.2d 815 (1989); State v. Jones, 00-162 (La.App. 5 Cir. 7/25/00), 767 So.2d 862.
State v. Johnson, 00-1552, pp. 4-5 (La. App. 5 Cir. 3/28/01); 783 So.2d 520, 525, see also State v. Rice, 626 So.2d 515, 521 (La.App. 3 Cir.1993).
It further appears that reference to the jury sheets reveals that only two of the venire members enumerated were excused due to peremptory challenges. "The purpose of the rule of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) is to prevent the State from using peremptory challenges to exclude men and women from jury service solely on the basis of race." State v. Guillory, 97-179, p. 38 (La.App. 3 Cir. 3/11/98); 715 So.2d 400, 421, writ denied, 98-955 (La.10/9/98); 726 So.2d 17. Thus, the rule is not directed toward challenges for cause.
In light of the jurisprudence, we conclude that using two out of six peremptory challenges on Black venire members does not establish a prima facie case of discrimination. Therefore, this assignment lacks merit.

ASSIGNMENT OF ERROR NO. 5:
In his fifth assignment, Defendant claims that his convictions for forgery and *864 theft constitute double jeopardy. This court has recently reiterated the analysis of double jeopardy claims:
The rule concerning a claim of double jeopardy arising from a single chain of events, as in this case, was set forth by this circuit in State v. Love, 602 So.2d 1014 (La.App. 3 Cir.1992), where this court applied the "Blockburger test" and the "same evidence test" in determining whether double jeopardy exists.
The "Blockburger test" was set out by the United States Supreme Court in Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), where the court stated:
The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not....
The "same evidence test" has been adopted by the Louisiana Supreme Court and was explained by the court in State v. Steele, 387 So.2d 1175, 1177 (La.1980), as follows:
If the evidence required to support a finding of guilt of one crime would also have supported conviction of the other, the two are the same offense under a plea of double jeopardy, and a defendant can be placed in jeopardy for only one. The test depends on the evidence necessary for conviction, not all the evidence introduced at trial ... The "same evidence test" is somewhat broader in concept than Blockburger, the central idea being that one should not be punished (or put in jeopardy) twice for the same course of conduct.
State v. Arnold, 99-742, (La.App. 3 Cir. 4/11/01); 801 So.2d 408.
In State v. Doughty, 379 So.2d 1088 (La.1980), the supreme court held that simultaneous theft and forgery convictions constituted double jeopardy. The Doughty court reached this conclusion by way of the "Blockburger test," explaining:
Applying the distinct fact test, we conclude that there is only one offense in this case because the evidence required to support a conviction on the theft charge would have been sufficient to warrant a conviction on the forgery charge. Theft is defined as the misappropriation or taking of anything of value of another either without his consent or by means of fraudulent conduct. La. R.S. 14:67. In the present case, since the cash and merchandise obtained by the defendant were given over with consent, the evidence that the goods were transferred for a forged instrument was crucial to proof of theft by means of fraudulent conduct. Furthermore, no additional fact, beyond that necessary to prove the theft charge, was required to warrant a conviction on the forgery charge. Forgery is the false making or altering, with intent to defraud, of any signature to, or any part of, any writing purporting to have legal efficacy; or issuing or transferring, with intent to defraud, a forged writing known by the offender to be a forged writing. La.R.S. 14:72. Since it was necessary to prove that the check was forged and that defendant knew it was forged in order to prove the essential fraudulent element of the theft crime, proof of no additional fact was required in order to convict defendant of forgery.
Id. at 1091.
A review of the discussion in the first assignment reveals that the same facts supported both convictions. Utilizing the Blockburger test, the present convictions would also constitute double jeopardy.
*865 The remedy for a double jeopardy violation was discussed extensively in Arnold:
Relator was sentenced to ten years at hard labor on the charge of attempted manslaughter and seven years at hard labor on the charge of aggravated escape, with one-half of the sentence for manslaughter to run currently [sic] to the aggravated escape sentence. In our original writ decision, we vacated the conviction and sentence for the less severely punishable offense (and the less severe sentence), aggravated escape, and affirmed Relator's conviction and sentence of attempted manslaughter.
In Butler, 558 So.2d 552, 553-554, the supreme court explained:
To remedy a violation of double jeopardy, this court has followed a procedure of vacating the conviction and sentence of the less severely punishable offense, and affirming the conviction and sentence of the more severely punishable offense. State v. Doughty, 379 So.2d 1088 (La.1980). In another case, this court followed the same procedure by vacating the conviction and sentence of the less severely punishable offense, but vacated the sentence of the affirmed conviction and remanded for resentencing. State v. Dubaz, 468 So.2d 554 (La. 1985). Although slightly different, these procedures are consistent in that each requires the court to vacate the conviction and sentence for the less severely punishable offense. In Dubaz, the court merely added the step of vacating the sentence of the affirmed conviction and remanding for re-sentencing. Further, resentencing was not an option available in Doughty because of the due process concerns of North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969) which prevent the imposition of a sentence that is more severe than the original one. The procedures of the Doughty and Dubaz cases form the general rule for remedying violations of double jeopardy.
* * * * *
The State's assertion that this court erred in vacating the most severe sentence instead of the "most severe actual sentence," the aggravated escape conviction of seven years, is without merit. First, this is not a case in which the defendant was sentenced pursuant to a sentencing recommendation, to a specific sentence, or in which restrictions on the original sentence such as limitations on parole, probation, or suspension of sentence prevented restructuring of a new sentence that was not more severe than the original sentence. Secondly, Relator's conviction and sentence for aggravated escape was the less severely punishable offense and the less severe actual sentence whereas the sentence imposed for the attempted manslaughter conviction was the most severely punishable offense and the more severe actual sentence. Thus, this court did not err in vacating Relator's conviction and sentence for aggravated escape.
Arnold, 801 So.2d at 424.
In other Louisiana jurisprudence, the general remedy has been vacation of the lesser charge. See, e.g., State v. Johnson, 97-867 (La.App. 5 Cir. 4/15/98); 711 So.2d 848, writ denied, 98-1293 (La.10/9/98); 726 So.2d 20, State v. Le-Blanc, 618 So.2d 949 (La.App. 1 Cir.1993), writ denied, 95-2216 (La.10/4/96); 679 So.2d 1372, and State v. Smith, 600 So.2d 919 (La.App. 4 Cir.1992), writ denied, 625 So.2d 1031 (La.1993).
In the present case, there was no plea bargain, agreed-upon sentence, or sentencing limitation upon parole, probation, or suspension of sentence. Therefore, the appropriate remedy is to simply vacate the *866 lesser conviction and sentence, without remand. As the theft conviction was punishable by not more than two years, and forgery was punishable by up to ten years, the theft conviction and sentence are vacated.
Defendant's convictions for forgery and theft violated double jeopardy; therefore, the conviction and sentence for the less severely punishable offense, theft, should be vacated.

ASSIGNMENT OF ERROR NO. 6:
In his final assignment of error, Defendant argues that his sentences were excessive, and that the trial court failed to comply with La.Code Crim.P. art. 894.1, in that it failed to state the considerations supporting the sentence. We have concluded that Defendant's conviction and sentence for theft should be vacated. Therefore, Defendant's arguments are moot as to that sentence.
Defendant's argument that the trial court did not supply reasons for the forgery sentence is negated by the record. In open court, the sentencing judge recited approximately two pages of reasons supporting Defendant's sentence. Thus, this portion of his assignment lacks merit.
In conducting an excessiveness analysis, this court has explained:
In determining whether a sentence is unconstitutionally excessive, we apply the following standard:
La. Const. art. I, § 20 ensures that "[n]o law shall subject any person to euthanasia, to torture, or to cruel, excessive, or unusual punishment." A punishment is considered constitutionally excessive if it "(1) makes no measurable contribution to acceptable goals of punishment and hence is nothing more tha[n] the purposeful and needless imposition of pain and suffering; or (2) is grossly out of proportion to the severity of the crime." State v. Wilson, 96-1392, p. 3 (La.12/13/96); 685 So.2d 1063, 1065 citing Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).
State v. Blackmon, 99-391, p. 5 (La.App. 3 Cir. 11/3/99); 748 So.2d 50, 53, writ denied, 99-3328 (La.4/28/00); 760 So.2d 1174.
As the trial court observed:
M. Wilson, on October 16, 2000, a jury of your peers unanimously found you guilty of one count of theft of $100.00 or more, but less than $500.00 and one count of forgery.
The penalties for committing theft of $100.00 or more but less than $500.00 shall be imprisoned with or without hard labor, for not more than two years or a fine of not more than $2,000.00 or both and for committing forgery, consist of a fine of not more than $5,000.00, or imprisonment, with or without hard labor, for not more than 10 years, or both.
Your criminal record is lamentable. As the Pre Sentence Investigation Report, made part hereof by reference, shows, since 1981 you have been committing crimes. You are legally a forth [sic] felony offender, although your rap sheet shows five felony convictions (because you pled guilty to a third felony offense prior to pleading guilty to a second felony offense).
Your criminal record is replete with crimes between 1981 and 2000.
In short, you are a forth [sic] felony offender and not entitled to a suspended sentence or probation.
What you have done, is in the eyes of this Court, unforgivable. No one can feel sorry for your being punished.
* * * * * * * *
The Court finds as fact that:

*867 1) There is an undue risk that during the period of a suspended sentence or probation, you would commit another crime.
2) You are in need of correctional treatment or a custodial environment that can be provided most effectively by your commitment to a penal institution.
3) A lesser sentence would deprecate the seriousness of your crimes for which you were convicted.
In view of this, this Court sentences you to one and one-half years at hard labor on the count of theft, (violation of LRS 14:67), and eight years at hard labor on the count of forgery, (violation of LRS 14:72) to run concurrent.
The court sentenced Defendant to two years less than the maximum sentence for forgery. In State v. Gant, 29,169 (La.App. 2 Cir. 1/22/97); 687 So.2d 660, writ denied, 97-465 (La.6/30/97); 696 So.2d 1006, the court found that a maximum sentence of ten years was not an abuse of the trial court's discretion, even though the young, pregnant defendant was technically a first offender. The defendant had similar offenses as a juvenile that indicated a propensity to violate the law. Also, she committed the crime while still on juvenile probation, and had reduced her exposure by plea-bargaining. Id. at 662-663. In State v. Pegues, 26-133 (La.App. 2 Cir. 8/17/94); 641 So.2d 1080, the court held that three consecutive six-year sentences for three counts of forgery were not excessive, given that the defendant was a fourth felony offender, and on probation when he committed the offenses. In State v. Davis, 571 So.2d 210 (La.App. 3 Cir.1990), this court held that an eight-year sentence for forgery was not excessive, as the defendant was a third felony offender.
In light of the jurisprudence, especially Davis, we conclude that the present Defendant's sentence does not constitute an abuse of the trial court's sentencing discretion. Therefore, this assignment lacks merit.

CONCLUSION
Defendant's convictions for both forgery and theft, based upon the same evidence, constitute double jeopardy. Therefore, the conviction and sentence for the lesser of the two crimes, theft between $100.00 and $500.00, is vacated. The conviction and sentence for forgery is affirmed.
REVERSED IN PART; AFFIRMED IN PART: THEFT CONVICTION VACATED AND SET ASIDE; FORGERY CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] A program under the aegis of the Work Investment Act, formerly the Job Training Partnership Act (JTPA).
[2] The statute has since been amended, so that the lower threshold value is $300.00, rather than $100.00.
[3] Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).